May it please the Court. This is an en banc panel, and as such, it's not bound by the opinion of a three-judge panel. So I'd like to focus my arguments this morning, actually this afternoon, not on the issue of stare decisis, but rather on the issue of applicable commitment period, and whether it applies to some debtors based on the calculation of projected disposable income, or does it apply to all debtors, regardless of the projected disposable income calculation. I'd like to start by talking about the absurd result that was created by the Kagan-Bama opinion, and that is, this is what the opinion holds. If there is no projected disposable income, there is no applicable commitment period. And by that holding, what it created is two classes of debtors, one class for which if they had projected disposable income, then the applicable commitment period applied. And for those debtors, if they were above the median income for their applicable area, then it was 5 years. If they're below, it was 3 years. What the holding in Kagan-Bama did is it created another class of debtors. If you had no projected disposable income, then there was no applicable commitment period, and the plan was to do nothing. Kagan-Bama Nothing to commit, right? If you haven't got projectable income, disposable income, what is it to commit to? To do nothing every month for 5 years or 3 years? Isn't sort of 12 times 5, isn't 60 times nothing the same as 36 times nothing? It's equal to 0 times nothing? It's all nothing. So what are you committing to? Well, Your Honor, in this particular case, the circumstances at plan confirmation warranted the pledging of tax refunds. And in this case, we actually have received tax refunds that have come in since the So in this case, it would make a difference of whether there was 3 years of tax refunds or 5 years of tax refunds. The question is alluding to someone who pays off their plan early and whether the case should continue. Kennedy But if this was known at the time the plan was adopted, then that should have been taken into account in calculating projected disposable income. If you know you're going to get tax refunds or you've got an ancient relative who's about to die and leave your fortune, or that you have a huge liability down the road that might change future disposable income, that's taken into account at the time the plan is adopted. But if at that point there was no disposable income, what are you committing to at that point? Are you just sort of committing to have a yoke around your neck for no reason at all? Kagan Are you referring to a debtor where there is no projected disposable income, and what is the plan going to do at that point in time? Kennedy Exactly. Kagan Oftentimes the plans the main reason why people come into Chapter 13 is to catch up on the arrears on the house because they're behind on their payments in the house, or they're behind on their payments to the Internal Revenue Service and they're going to be paying their tax, taxes through the plan. The projected disposable income calculation determines what the percent is to the unsecured creditors. And it's the trustee's position that the language in subsection B-4, because of the mandatory nature in that language, Congress intended to create a minimum plan duration that people would stay in in exchange for the disposable income. Kennedy You know, I do understand, and that's what you started out saying, which led to my question, saying to do what? If your projected disposable income is zero or negative, then you have no commitments to pay anything. So it's not like you get a loan and you commit to pay every month a certain amount. That's a commitment. But if you're – am I misunderstanding the law here? Am I wrong? If at that point it looks like you're not going to have any disposable income for the next 3 years or 5 years or foreseeable future, what does the plan commit you to do? Gershengorn The projected – Kennedy Just answer the question. What does the plan commit you to do at that point? Gershengorn It depends on the reason why the debtor has come into Chapter 13. Now, the means test calculation, the calculation of projected disposable income, the only thing that functions – Kennedy I'm not going to forget about my question, no matter how much you talk. Gershengorn Maybe I don't understand the question. Kennedy What do you commit if you've got no projected disposable income? Okay? It looks like you haven't got any at the time the plan is confirmed. You're in the hole. You're going to be in the hole for the foreseeable future. What are you committing to do for the next 3 years or 5 years or 7 years or however long the plan is? Gershengorn If there's no projected disposable income, then there's nothing that needs to be paid to the unsecured debtors. Kennedy I'm sorry? Gershengorn If there's no projected disposable income, then there's nothing that needs to be paid to the unsecured debtors. Kennedy So what are you committing to do for the next year? Gershengorn It would depend on the facts of the case, whether the debtor was coming  into the plan to cure arrears or whether the debtor was coming into the plan to cure arrears on the house or possibly to pay back due taxes or to do both. Kennedy What happens if someone has no disposable income but still has savings? How does it work then? Gershengorn Well, at the time they file their petition, an estate is created. So if they have savings in the bank account, that is actually an asset of the estate, and it's looked at differently than the disposable income, which is the income minus reasonable expenses that would go to fund the plan. So if there's savings in an account at the time that they file their petition, that would be an asset of the estate, which could be exempted. If it's not exempted, then it's a different test that applies in 1325a, which is what we call the hypothetical Chapter 7 liquidation test. Scalia Well, isn't one of the practical considerations that all the economic future cannot be predicted necessarily at the beginning and that his circumstances or her circumstances could change over the 60 months, in which case either the creditors could file for some sort of an adjustment or other arrangements could be made that couldn't have been foreseen at the time that Chapter 13 was entered into? Gershengorn Yes, that is correct. That is correct. If there is a change, and it doesn't – it could be a change for the better. It could be a change for the worse. But the debtor would be able to modify the plan. There's a case in the case. Kennedy I understand that that's the case, but you still haven't answered my question. You said if, you know, it depends on this, it depends on that. But you haven't told me what happens if this or that. What does a debtor commit to? Just give me – pick any version of it. What do they commit to do during the plan? Pick your version of facts and just tell me what they commit. Gershengorn When they come in, they propose a Chapter 13 plan. So the plan is going to take care of whatever it is financially. Kennedy Just say what they commit to. Don't say about anything else. Just answer that question. Kagan How about in this case? What is the debtor committing to do? Gershengorn In this case, the debtor – the debtor had no arrears and I believe had no tax – let me just double-check my notes. Kagan Do you not know this case? Gershengorn In this case, the debtor was current on arrears. The main reason why this debtor is in this case is to do what we call – Kennedy Just answer the question. In this case, what is the debtor committing to do? Don't give us any more history. Don't give us any more – just answer that one. Gershengorn In this case, the debtor is committing to pay certain number of dollars per month for a certain period. Now, the debtor proposed the plan at 36. The judge ordered the plan at 60 and pay 1 percent to the unsecured creditors. This particular debtor had negative projected disposable income under the means test calculation. The main reason why this debtor is in this case is to do a lien strip. The lien strip would be a valuation motion. If the lien is wholly – if the junior lien is wholly unsecured, then the plan would pay the junior lien holder per the percent in the plan. So in this case, the incentive of the debtor is to effectively take care of the junior lien when the debtor is completed and receives a discharge. But here, as I understand it, the debtor voluntarily agreed to pay 122 per month. Is that correct? Yes. Could the debtor propose to pay nothing, as Judge Kaczynski is alluding to? He was not obligated to pay anything, correct? The trustee's position, if that had been the situation, would be this is – should be a Chapter 7, because that's exactly what Chapter 7 does. But was the debtor obligated to pay anything? I'm sorry? Was the debtor obligated to pay anything as a result of the PDI, or the potential disposable income? Nothing to the unsecured creditors. It was a negative. It was a negative 665. Correct. Correct? So there was nothing that was obligated to be paid under the means test to the unsecured creditors. That is correct. Could the debtor have just proposed, I guess, what, a plan without any payment? Not over the objection of the Chapter 13 trustee. We would be objecting very – The court could confirm it. I think that's the question. The debtor could propose it and the court could confirm it. That is correct. Your position is that's not in bad faith and you want to convert it to a 7. But theoretically, you could propose a no-payment plan to unsecured creditors if they met the criteria, right? You could. In fact – And you could propose, let's say it's just a tax average case, and they clear up the taxes in three years. So then what happens if the court had confirmed that for a no-payment unsecured creditors? What happens under your theory of the law? Does nothing happen for the other two years? It's just under the supervision? Well, it's difficult because there's also very practical things that we do at the 341A. And one of the very practical things that we would do is we would probably reduce the plan payment to pay it over 60 months rather than letting them complete it three years. I understand that. I'm just talking about theory because we're talking about how to apply the law here. So in theory, let's say you have a tax payment that gets paid out over three years. You'd want to adjust it, but let's say that that's the proposal. Debtor wants 36 months, no disposable income. And your position would be you've got to do a five-year plan anyway. And if he finishes paying the IRS in three years, too bad. We're going to keep monitoring for the other two with no payments. So there's no change. Right? Well, that would be one way that it could happen. And but we would prefer to have a string of payments coming in through the entire 60 months. And if the payment was reduced, then there would be a greater likelihood of planned feasibility, because now the debtor is paying less per month over a longer period of time. But we're talking about minimums. We have to kind of look at these. You might call them absurd examples because they don't happen often in real life. You work through them, but that's the – that would be the effect of your position under that scenario. It could be the effect of our – of the trustee's position, but it doesn't necessarily mean that is what would happen. No, I understand. And as I indicated, in this case, because of the circumstances at plan confirmation, there was a pledging of tax refunds. So in addition to the payments that were proposed under the plan, there was also a pledging of the tax refunds. So over that 5-year period of time, there would still be greater opportunity in which to monitor the – for tax refunds. Now, it's possible that we could get to the 3-year point and the debtor could modify the plan down to reduce the term. And see – we could see what the court is. And this is – this is kind of an interesting area of the law that's developing. It's a case out of the Ninth Circuit. It's a Ninth Circuit bankruptcy appellant panel case. It was cited by my colleagues at American Express, but it dealt with a situation where a debtor had paid off the plan. They had paid what was required under the projected disposable income analysis, and they filed a motion for a discharge. And the court said, no, you need to modify your plan to reduce the term. It went up on appeal to the bankruptcy appellant panel. The bankruptcy appellant panel concurred and said, yes, you need to modify the plan to reduce the term. That way, under Federal Rule – Federal Bankruptcy Rule 3015, all of the creditors and all of the interested parties get notice that you're modifying your plan down, and it gives everyone an opportunity to look at the circumstances under which you were able to pay off the plan early. So we believe that the 60-month or the 3- or 5-year period is a mandatory term under the Code, and that the only criteria that determines whether someone is 60 months or – well, excuse me – 5 years or 3 years is related to the income they're making, not related to the calculation of projected disposable income. The only exception in the statute created in subsection B-4 is if the plan proposes to pay everyone in full. There is no exception in the statute, nothing written in the plain language of the statute that says if you have no projected disposable income, you have no applicable commitment period. It's only with the rationale of Kagan-Vema do you get to that conclusion that subsections 2, 3, and 4 in 1325b are exclusively linked and their sole purpose is to define terms for purposes of calculating projected disposable income. Sotomayor, you mentioned the BAP case. Is that Sunnahara? Is that the one you were referring to? No, no, Your Honor. It's Friendly v. Foresight. Was that cited in one of the briefs? It was cited in the American Express brief. Very well. Thank you. Thank you. Okay. I see that I've used my 15 minutes, and if the Court would please, I'll turn the podium over to my colleagues. May it please the Court. William Andrew McNeill, appearing for Amicus Curiae, American Express, supporting the appellant of Chapter 13 trustee, Mr. Rod Danielson. I'd like to cover briefly three points today, this afternoon. That is, first, the statutory determinant of applicable commitment period. Secondly, the statutory employment or use of applicable commitment period. And finally, the harmonization of that usage to the purposes of bankruptcy. To begin, American Express would argue that Section 1325b-4 of the Bankruptcy Code explicitly and indisputably requires that a Chapter 13 plan's applicable commitment period be determined by the debtor's current monthly income and not any other income figure whatsoever. There is no mention of any other income figure except for current monthly income. The applicable commitment period shall be 3 years or not less than 5 years, depending upon whether the debtor's current monthly income is less than or greater than the median for his state of residence. Second, Section 1325b-4. In this case, the debtor's median income is only about $1,000 higher than that of the citizen of the State of California, right? Does the judge have any discretion in making that determination? It seems that $1,000 is very close to being to the, you know, the next lower level. It seems like maybe the judge should have some discretion there to, you know, alter the period based on the fact that they barely are above, you know, barely getting there with a family of five. No, Your Honor. There is no discretion. The current monthly income is either above or below the State's median. And how is that determined? What numbers do you use as your data point? The statute sets forth the definition of current monthly income and how it's determined in Section 10110a of the Code. And it's basically a 6-month average, the pre-petition 6-month average of the monthly income of the debtor, the current monthly income of the debtor. As compared to what? As compared to the median income for the State. In what period of time? The 6 the median income. The median in the State in what period of time? Oh, the most recent figures that are provided by the U.S. trustee program. Second, American Express argues that 1321 1325b1b plainly requires that all of a debtor's projected disposable income, all of it, that he proposes to pay into his plan, all of it must be paid throughout the entire applicable commitment period. The statute books no foreshortening of the applicable commitment period or adjusting it in any way, shape or form. I'm reminded of the legal maxim, casus omnis proviso habendus est. That the matter, a matter that is omitted is to be held or treated as omitted. Counsel, if you can address a point that I think the other counsel was talking about. If within the 5-year plan period, the debtors, for example, come into an unexpected inheritance, there's nothing that prevents that debtor from coming in seeking a modification of the plan to be less than 5 years, provided that all the creditors are then paid within that shorter time period. Is that correct? That's correct, Your Honor. That right is enshrined in section 1329 of the Bankruptcy Code. And does that end the plan? I beg your pardon? Does that end the plan? It may. So if there are no payments at all, why would you have a plan at all? I mean, let's say you have a you calculate the commitment period to be 3 years or 5 years, but then when you look at the disposal of income, you say they're negative, they don't have any. What why isn't the plan terminated at that point? Because you've paid up. What's your owe? You made a commitment, and as soon as it goes into effect, you're paid up. Right? If it's a zero-payment plan. Your Honor, I believe we're conflating terminating the plan under the powers afforded to the court under section 1329 of the Code with the applicable. Okay. You mean you and me together? I beg your pardon? You say we are? You mean you and me together are doing that? Why don't you answer my question, and then you can tell me? What is your question again, Your Honor? Well, see, you don't listen to the question. The question is why, if it's a zero-payment plan, and you have a 5-year plan and a 3-year plan, why isn't it paid up on day one because there's zero payments? I can think of two reasons. What's the point of having 36 more of those or 35 more payments like that, which amount to zero, or 60 or 90 or whatever? I can think of two reasons. First off, you used the word yoke, as I recall, Your Honor, a few moments ago. Perhaps that's a bit strong. But in fact, yes, the supervision of the debtor must be under the bankruptcy court for a period of 3 years or 5 years, depending upon the appropriate applicable commitment. I'm sorry. When you say supervision, you mean the bankruptcy court checks up on the, you know, gives an allowance or something? I mean, there's a bankruptcy court. What is a bankruptcy court? How do they supervise? Is it like probation officer? Do they have to come in and take urine tests and stuff? They're supervised by the adversarial process. If the trustee discovers that there's a reason to hail this debtor back into bankruptcy court during that period of time, she may do it. An unsecured creditor, such as my client, may attempt to do the same thing. Like what? What kind of thing would cause that? What kind of debt would set that off? Yes. I think the one that was just proposed here, a sum of money that the debtor came into at some point during the pendency of the plan, then, and this leads to the second reason to answer your question, and that is Section 1329, the right to move to modify a plan would be a very empty promise if there were not a period of time in which to utilize that right. For some plans, yes. For some plans, no. I mean, there are some plans you could modify. It wouldn't be empty. It would just only apply to some plans, right? But if the applicable commitment period were foreshortened, Your Honor, then the window of opportunity, the 5-year or 3-year period of time, would be closed off. So this is all about catching later income. That's all there is. No, Your Honor, that's not true at all. It's all about affording all parties, debtors, trustees, and creditors alike, the opportunity to move to modify the plan if some financial exigency, positive or negative to whatever party wants to be in court and moving to modify that plan, if some exigency occurs that was not anticipated at the time of confirmation. Right. But you don't mean that because, of course, it's a zero-payment plan. It can't get any better for the debtor. So there's nothing that can happen afterwards that will make things better for the debtor, right? So you really don't mean that. I'm answering every word I said. It's all about catching later income. No, Your Honor. That's the only effect. The plan can make things better for the debtor if it's a zero-payment plan. Oh, if it's a zero-payment plan, that's correct. Right. So if it's a zero-payment plan, the only reason to keep it in force is to catch later income. That's correct. And that's the point. I don't know why it takes so long to pull that out of you, but okay. Sorry. I think Judge Wadlow had a question. Okay. Great minds. Thank you. Can I ask you, Judge Thomas's earlier question suggested when I – that a debtor who proposes a zero-payment plan, that that might be in bad faith. Is that – what would determine that? There is – there is a set of – I believe it's 11 factors for a good-faith determination in this circuit, and most of the circuits share those same factors. How about in the case – how about in the circumstances of this case, the Flores's case, where they had – where their PDI was less than, you know, negative 600. If they had come in and proposed a zero-payment plan like Chief is suggesting, would that have been – would the response have been, oh, that's bad faith? If my client were a creditor, or a claimant in this case, and my client was not. We filed no – my client had no claim against this debtor's estate in bankruptcy. But if – if my client were, we would look – if we saw a disposable income that was a negative number and a projected disposable income that was also a negative number, that would be an important signal for us to probe further. Read the petition more closely. Read the forms more closely. And see if the act of projecting is compliant with – with the case law and with the statute. Well, there's no dispute here that there – you know, these forms that they filled out were filled out correctly, and all the information was correct and everything. Nobody here in this particular case, nobody questioned that. So I'm just curious. I mean, had they proposed a zero-payment plan, that would have been – what would be the grounds for challenging it as made in bad faith? Well, some courts have found that a so-called zero-payment plan, which generally is – it's a zero-payment plan, but they make sure that debtor's counsel is paid and trustee's administrative fees are paid. Some courts have found that to be very close to a prima facie bad faith situation. In other words, they don't think that that debtor doesn't belong in Chapter 13. And – Or should – belongs in Chapter 7? Perhaps. Or dismissal, outright dismissal. But that's a matter to be taken up with the bankruptcy court, right? You can object to the plan, say it should be converted to a 7. Very often the bankruptcy judge does. Right. But once a bankruptcy judge approves a 13, it's a 13, right? Once it approves a 13 plan, it's a 13. Well, he could still be dismissed, Your Honor, for failure to perform under his plan. Well, of course. Lots of stuff can happen afterwards. Sure. Counsel, before you leave, can we rule as you have – as you would prefer to have us rule without reviewing or even overruling the Maney case, Maney v. Kagan-Villanueva? Can you rule without overruling that case? In other words, is your position consistent with our precedent in Maney, which arguably may or may not be consistent with Hamilton, the Supreme Court case? No. The position I urge is not consistent with the portion of Kagan-Villanueva to which you refer. And therefore, we would have to overrule it? Is that what you're asking us to do or not? That's why we sought this out. Very well.  Thank you, Your Honor. Let me ask you this. Here you have – the debtor here is above the median debtors, and you have an applicable commitment period of five years. And then the debtor explains how she and her husband can pay that back in even a week, losing their credit card and all the rest of it. And it's up to the bankruptcy judge then to decide whether the debtor is capable of completing the plan in a shorter duration. Isn't that right? If a party moves to modify pursuant to Section 1329, yes, you are correct, Your Honor. Where does it say that? It says so in Section 1329 of the Bankruptcy Code, Your Honor. What does it say? It says that either the payments or the period for the payments may be adjusted by order of the Bankruptcy Court. Now, how much of this debt is credit card debt? I don't know, Your Honor. Well, don't you represent the credit card company? As I just said a moment ago, my client has no claim in this case. You're purely an amicus. What are you doing here? I'm here to say – He's a friend of ours. I'm here to – He's a friend of yours. I'm here, as I said at the beginning of my argument, I'm here in support of the appellant, Chapter 13, Trustee Mr. Rod Danielson. And why is that? Because we believe as a point, as a matter of law, the conclusions of law, that they are in the right position, and we want that – That conforms with your client's economic interest. Perhaps arguably in the long run it might, but not in this particular case, no. No, no. In the long run, you'll get more money. That's precisely why I'm here today, sir. The creditors use their credit cards, right? Yes, Your Honor. So – and maybe you helped create this problem. Your client did. Your Honor, that's outside the context of this case. Tell me that – aren't we concerned with fairness? I'm reminded of what Judge – I don't care what you're reminded of. I just ask you, aren't we concerned with fairness? Equity must follow the constraints of the law. The Supreme Court has made that clear. Well, fairness is part of the Bankruptcy Act philosophically and otherwise. Why do we have bankruptcy laws? To give people a second chance in this country. Isn't that right? In part, that's correct. The other half of that bargain is to repay creditors as much as they can repay. It's a – it's a bargain. It's, as you said, a fresh start for debtors, Your Honor, and a repayment of some of the indebtednesses back to the creditors. Yeah, but the goal is to get the bankrupt back on his feet. That's one goal. What's the other goal? Maximize repayment to the creditors, Your Honor. Credit cards. I beg your pardon, Your Honor? Pay the credit cards. That's the other goal. Or any other creditor. It doesn't have to be a credit card. Thank you, Your Honor. Thank you. We'll hear from the other side. Good afternoon, Your Honor. Rob Feaster from Kletushin, Bogdanoff & Stern, Pro Bono Counsel for the debtors, Cesar and Anna Flores, in this matter. The issue in this case, which I think there's been some imprecision about whether there's an applicable commitment period, I think that issue is a bit – stated a bit imprecisely. The question here is does the defined term, applicable commitment period, which appears in Section 1325B, does that specify a minimum planned length? And it's the trustee's position that an applicable commitment period equals a minimum planned length. That's not right. And I'd like to explain why that's not right for two reasons. The first has to do with the structure of Chapter 13 and the second has to do with the history of Section 1325B. Before I do that, let me say one word about terminology. In the briefing, there's been some reference to a temporal test and to a monetary test, kind of like in Lanning where they talked about a mechanical or a forward-looking. I think that those terms in this instance, a temporal test versus a monetary test, are at best unhelpful and at worst potentially misleading. And I think this is what kind of threw the Eleventh Circuit off in the Tennyson case. Before you get to that, when you say threw the Eleventh Circuit off and apparently the Sixth, is there any other circuit besides this one that has agreed with the position that you espouse and that was in the Kargan-Veyama case? Other than the Ninth Circuit as of today, no. So the problem with calling it a temporal test versus a monetary test is that of course the word applicable commitment period refers to a period of time. In the statute, it says you have a period of either 60 months or 36 months. Okay? That's undisputed. The issue is what is the function of that period of time? What do you do with that period of time? Can I ask you a question? Because I'm not really sure I understand how this works. In fact, I'm sure I don't understand how it works. Your client has a negative disposable income. Yes. Yet proposed to pay $122 a month. Yes. How can that be? Only because of Congress in BAPSIPA in 2005. Prior to 2005, a debtor's projected disposable income had a almost one-to-one relationship with what they could pay under a plan. So if you brought in $1,000 a month and you spent $500 a month, your projected disposable income to pay debt creditors is $500 a month. But it's a fiction. I mean, it's a statutory fiction. The projected disposable income is a number that's arrived at through a series of calculations. It's not – a negative projected disposable income doesn't actually mean that you have less than no money to live on. Only after the 2005 amendments. That's correct, Your Honor. So prior to 2005, it was an actual number. You could actually calculate a number due to unsecured creditors. And any bankruptcy attorney who practiced prior to BAPSIPA, the notion that you could have debtors like my clients who had a negative $600 a month in disposable income and yet are still funding a plan would be absurd. Well, you couldn't get that plan confirmed. No, because – Pre-2005, if you had no disposable income, you could take advantage of Chapter 13. That is precisely – that's precisely correct. So here's my broad-brush question. I may get you to kind of start on your statutory analysis. If you take that and the Bankruptcy Abuse Protection Act was not debtor-friendly – I think you'd agree with that. I think everybody thought that was a very pro-creditor bill. Why do you think Congress would intend to allow those who had negative income then to get Chapter 13 relief and still not buy the minimum terms that they would have had to pre-2005? Well, that's the issue, Your Honor. There was not a minimum plan term pre-2005. Well, that's the effect of what you're arguing. Well, it's not just that. If I – so let me explain just for a second. No, but I mean, pre-2005, it was – I know some courts were confirming, you know, plans of less than 36 months, but not many. And most were saying, look, if you're not paying back 100 percent, you've got to go 5 years. You'd agree with that? I would agree with that. And may I explain why? Sure. So before 2005, when the number wasn't just fiction, under the statute, a debtor, at the day of confirmation, was promising to pay his creditors the amount of his projected disposable income over 36 months. If at confirmation he was going to do that, but he was going to do it in 24 months or he was going to do it in 12 months, then something's wrong because you're calculating something – you're calculating something incorrectly because he just wouldn't have that income. So that's why it became almost a de facto 36-month plan length, but it could always be changed. And you see some of this in the case law that modification and prepayment is an issue. So I want to talk about the interplay of two statutes. One is 1322 of the Bankruptcy Code, which is called contents of a plan. It tells you what to put in your plan. It tells you what must be in your plan, what may be in your plan, and what may not be in your plan. 1322 addresses plan length. It addresses it in subsection D. What subsection D says is that a plan may be as long as 36 months for below-median debtors and 60 months for above-median debtors. It says nothing about a minimum plan length. Now, that's important because I'm a little bit more familiar with Chapter 11 practice, where you first file the petition and then you negotiate with all your creditors and then you file a plan. That's not how it works in Chapter 13. Chapter 13, the day you file your petition, you also file your plan. So you have to know on day one what kind of plan you're going to propose. That should be in 1322. That's why the maximum length is in 1322, so you know what kind of a plan to propose. And if there was going to be a minimum length, it would be in 1322 as well, because that's where you'd find it. 1325 is the second statute, okay? And that's entitled confirmation of plans. And what 1325 does is it sets up a test for a judge at one point in time called the confirmation hearing for the judge to say yea or nay on the debtor's plan. Now, critically, two subsections of 1325. The first, Section 1325a, sets out the requirements that must apply to every Chapter 13 plan. There's nine of them. It must comply with Title 11. You must pay all your fees. You must have acted in good faith, et cetera, et cetera, okay? If there is no objection to confirmation and a debtor files her plan under Section 1322, comes to confirmation, okay, and no one objects, the judge has to make an independent finding on all the A-Factors, and then that's it, okay? Subsection B is different. Subsection B, and it was written by Congress to be different, okay? It wasn't in the original 1978 Bankruptcy Code. It's triggered only by an objection by either the trustee or by an unsecured creditor. And once it's triggered, which you wouldn't know before you file your plan because you don't know who's going to object. Once it's triggered, there's a test called the Projected Disposable Income Test or what used to be called the Best Efforts Test in some of the older case law. So what is this Projected Disposable Income Test that a judge has to apply at confirmation if there's an objection, okay? First of all, we know it is a snapshot in time. We know that because 1325B1 refers to as of the effective date of the plan. We know from Lanning and from many other cases that the effective date of a Chapter 13 plan is the date on which the plan is confirmed. Can I ask you a question about where you're headed here? If Subsection B is triggered, if there's an objection, is it your view that all debtors have an applicable commitment period? Yes. Or that only some debtors have? All. I think the Coggin-Villama case got that wrong. And that's why I'm glad the Court took it en banc. The Coggin-Villama case, and if you'd like, I'll just do a very short aside on this. The Coggin-Villama case said the applicable commitment period is a temporal concept that specifies a minimum plan length. But for a certain class of debtors, those with zero or negative PDI, it doesn't apply. That doesn't work. The 1325B4, the applicable commitment period, is not this temporal concept, okay? And let me show you the absurdity of that. Under the trustee's reading, if a debtor had income of $1,000 a month and expenses of $999 a month, that debtor has a PDI, a projected disposable income of $1 a month. Their amount that must be paid to unsecured creditors under the plan upon a proper objection is $60. But under the trustee's view, they must only pay $1 per month, each month, for 60 months. They can't liquidate a 401K, for example, to pay the $60 off a confirmation. They can't borrow it from their grandmother. They can't do anything else. So the distinction between clients, like my clients, who have a negative PDI and clients with a positive PDI has to do with what amount you're ultimately going to have. But I do agree that Coggen-Fiamma, it's correct as to the result with my clients. It is incorrect when it references a temporal element. Counsel, do I hear both you and Mr. McClain arguing for an overruling of Coggen-Fiamma, but for different reasons? Is that what I'm hearing? You do, sir, yes. Okay. So let me go back to the projected disposable income test, which, again, is only triggered upon an objection. So number one, we know that it is a test that is a snapshot in time. It's as of the effective date of the plan, as of the date of confirmation. Okay? Number two, there's two ways to satisfy the projected disposable income test. There's B1A, which says that if the objector  the value of the property to be distributed under the plan on account of such claim is not less than the amount of such claim. There's been an argument in the papers that B4 something, the one at the very end that says you can have a different applicable commitment period if you have a different, if you pay off your creditors in full, there's been a claim that that's a redundancy. It's not a redundancy at all. The first part of the B1A test is if an unsecured creditor or the trustee objects the amount of money to be distributed on account of that unsecured creditor's claim. So let's push that aside for a second because that's not the test that's at issue here. Okay? So then you go to B1B. And what Congress decided is is that upon this proper objection the debtor's plan, as drafted, has to provide for a distribution to unsecured creditors as a class of all of the debtor's projected disposable income to be received, again, once again we're talking about a projection here, in the applicable commitment period. Which is a period of time. I didn't understand your argument when you said it isn't temporal. The applicable commitment period is a period of time. It's either 3 years or 5 years. I think you were looking at 4B that says it can be less than 3 but only if there's a provision to pay everybody off, essentially. That's correct, Your Honor. And what I was trying to say is that the term by itself applicable commitment period of course is a period of time. But that's in B4 where it defines an applicable commitment period. B4, if you look at the structure of 1325B, okay, B1 is the substantive command which says either number 1 the person who's objecting is getting paid in full so you can't hear from them at all, that's A, that's B1A. Okay, or number 2 if B1B there's this test. And when this projected disposable income test was added to the statute in 1984 this is effectively all it said. It said you have to provide for distribution to unsecured creditors as a class over the life of the plan this amount of money. Okay. Now, as the statute was tested in the courts and as it was refined you ultimately ended up with this very long refinement of the statute which elaborates on B1. Okay, so if you look at B2 it's elaborating on B1 and we know that because it says for purposes of this subsection the subsection being B1 the term disposable income means X. Look at the next part of B 1325, B2 I'm sorry, B3 for purposes of this subsection this will tell you what amounts are reasonably expended which you have to know. And then finally you look at B4 for purposes of this subsection it tells you what the term applicable commitment period means. Okay. So in theory I'm sorry, in your view applicable commitment period has two different definitions based on the section that you're referring to? No, Your Honor. I think in B1 you have to read B1 is referring to an applicable commitment period that is defined in B4. Okay. And it is a period. Absolutely. Durational. When you say period you mean a durational. Yes. But what it's not it's not a minimum plan duration. Okay. And that's the problem. If it was a minimum plan duration it would be in section 1322 where there's a maximum plan duration which tells you how much time you're going to have to fulfill your plan. Well, I don't even understand how what if a trustee objects let's make this easy then 1325B is triggered. Yes. And under 1325B you can't have anything shorter than 3 years or 5 years depending on the financial circumstances unless everybody gets paid off sooner. So why isn't that a minimum plan duration? It's not a minimum plan duration because when you say you can't have anything less, the defined term, applicable commitment period, cannot be less than that. Okay. But nothing in B4 implies that, or nothing in B4 states that the defined term, applicable commitment period equals a minimum plan duration. Now, the reason why people thought that this could be the case the reason for some confusion on this is because pre-BAP-CIPA the disposable income test did not say within the applicable commitment period. It said within the 3 year period. Okay. And so people took that to mean, oh well a plan has to be at least 36 months long upon an objection. And for 99.99% of cases that was true because remember, pre-BAP-CIPA we were dealing with real numbers. Okay. So if a debtor, again, if a debtor came in and had a projected disposable income of $100 per month, that was based on a real number. It was based on their actual income and their actual expenses. If that debtor was proposing a plan and the trustee rejected, when you applied B-1 in that instance you said, well, I have to make sure this debtor is not abusive. Okay. Because that's what B is, a check on abuse. And is the debtor distributing at least as much as their projected disposable income over a 3 year period? If they were doing that, 99 times out of 100 they're going to be in a 3 year plan. Otherwise there's something, you're doing your projections wrong. But see, BAP-CIPA totally upended that. And that's how you have this bizarre situation where you have my clients who under BAP-CIPA, under Congress's own guidance, allegedly have $600 less each month than they actually have. So that's why ACP, applicable commitment period, yes, it is a period. It used to be a 3 year period. The reason they changed it to applicable commitment is because they wanted to have a 5 year for certain debtors and a 3 year for others. That's the only change they made to that in 2005. So are you saying that because you have to identify the amount of the projected disposable income on the date of confirmation, unexpected monies that might arise during the duration of the plan are not subject to the access by the unsecured creditors? No. And what I'm saying is the confirmation requirements are a snapshot. The judge says yes on the snapshot. If in subsequent months of performing the plan, changed circumstances show that there's new money available. But under your theory, they wouldn't still be performing the plan. It would be over. I mean, let's go back to your example of $1 a month available for 60 months. And your view, I think, would be that if the debtor wanted to pay $60 right then, and that were fair, because that's really what they had available, they could pay it and the plan would last one month. Or it could. The bankruptcy court could say that. Theoretically, it could. And if it did, and 6 months later, this debtor got, you know, a million dollars from Uncle Joe who died, even if he knew Uncle Joe was sick, he didn't necessarily know he was going to inherit, so it's not fraudulent, that that's unavailable to the creditors. It is, but let me tell you why I think that... And that's what Congress meant, you think. Well, first let me tell you why I think that won't happen in the vast majority of cases. Because people seeking Chapter 13 relief, we're focused here on the distribution to unsecured creditors. But as the Trustees Council pointed out, people seek Chapter 13 relief to cure arrearages on their home mortgages, to pay back taxes. So even if, in my example of somebody who has $1 in projected disposable income, there's no sound reason why they couldn't propose a 36-month plan. Right. Because they have secured creditors, too, and there are other reasons that they do it. But in real life, there are very short plan durations now in some cases. And I guess in theory, the situation that I described could happen. And I guess if we're looking at what did Congress have in mind, I just have some difficulty wrapping my brain around that being what Congress had in mind. Your Honor, I definitely understand that, and I have difficulty understanding how somebody with negative disposable income can fund a plan. There's a lot of problems in that SIPA. But let me say this. This, under your example, or under my example, which you adopted, of the debtor with $1 per month of projected disposable income being forced to spread out their plan over five years, that harms secured creditors, okay, because secured creditors want to get paid faster. And why should they have to wait five years? Would it prevent that? This is a true question. I really don't know how this works. If the bankruptcy court were to say, okay, your duration is 60 months, and with respect to unsecured creditors, you pay $1 a month, does that necessarily mean that the payments to the secured creditors would have to also be equally divided in 60 parts or not? It does not mean that they would have to be. But if you were debtor's counsel and you had to propose this. You would ask for that. But the bankruptcy court could treat secured creditors differently than unsecured or make adjustments as appropriate? Yeah. It would be possible. But, again, I think if you're the debtor's counsel, and most examples are not going to be $1 of disposable income a month. Right. I understand that. But stretching it out, I think there's this notion from the trustee and amicus that stretching it out is always some great advantage to creditors. And that's not true. It's a great advantage to unsecured creditors. But it's not a great advantage to secured creditors, to the IRS, to others. Counsel, I'm interested in how you were going to end the sentence that you didn't get to finish a minute ago, and you probably want to know which of several that might be. But it's the sentence that you started when you were talking about Judge Graber's example of the $1 a month person, and then a large amount of money becomes available. I was unexpected at the beginning, but the person inherits a lot of money. And I think, if I'm following you, that the option would be 1329, is that right? That is correct, yes. And is that only an option as long as the plan is ongoing? That is only an option until completion of payments. There is a dispute in actually all of the courts whether completion of payments means did you tender your last payment or did the trustee accept it? Because in this trustee's district, if my client is a debtor who has a certain dollar amount in their plan to pay, if they tendered a check to the trustee, the trustee wouldn't accept it, and the trustee – so the trustee would not allow them to complete their payments. The trustee would return the check and say, no, no, you must be under the yoke of Chapter 13 for five years. So, yes, completion of payments is an issue, but I don't think the Court needs to resolve that, just like I believe your dissent in the panel decision indicated that you don't think the Court needed to weigh in on completion of payments. Does completion of all payments also mean discharge under 1128? It does not necessarily mean discharge. Oh, I know. Because a discharge is a separate part of the plan. It's 1328. Pardon me. It's a different part of the code. It's Section 1328. In order to receive a discharge, you must have a discharge. That's if you fully performed and you get the so-called superdischarge. There's also a hardship discharge that you can get under 1328e, but it's pretty hard, and Congress made it even harder. So in Judge Graber's – in your scenario with a dollar a month and it gets paid off because the debtor – maybe the grandfather gives the debtor 60 extra bucks and pays the – all the payments. Can the debtor move for a discharge? There are – With 40 – with? 59 months left. If the court accepted that the payments had been complete under the plan, that is, if the trustee accepted the payments and the plan became complete, I can't think at the moment of any reason why a discharge in that instance wouldn't be appropriate. But again, Chapter 7 discharge. Would termination of the plan be automatic or would it be subject – let's say the trustee accepts the payments. What happens next? Sure. So this is actually – this brings up one of Judge O'Scanlan's questions, which was on the Sunnahara case. And the Sunnahara case says a – where a debtor – the debtor in that case wanted to refinance his home and tender the balance of his Chapter 13 plan. He moved to modify the plan to do so. He came in and made a motion. And what the court says in a footnote in Sunnahara is, you know, most of the time we don't see motions to modify. We just see people writing the check. And the Chapter 13 trustee accepted the check. The reason that the debtor in Sunnahara had to make a motion is because he was refinancing his home and the mortgage company wouldn't give him a mortgage unless his Chapter 13 case was closed. So it does happen. But the way I look at these early plan payment cases is these are a small window into pre-BFCPA practice. Because, remember, 99 times out of 100 in a pre-BFCPA practice, if you've made 36 months or so – I'm sorry. If you've answered my question already, I missed it. Pardon me, Your Honor. If you're still answering it. My question was, if you pay off the plan payments in full, does the plan terminate automatically? Does it go to court and have it modified? What happens if – If you pay off all plan payments and the payment is accepted, at that point the plan is nonmodifiable under 1329a, because it can only be modified until completion. But that doesn't mean you get a discharge. You still have to ask for the discharge. So your plan – But what would the test be at that point? To follow the Chief Judge's question, if all the payments have been made, what other issues would arise that would affect the potential discharge? 1328, I believe, after BFCPA, has some very voluminous requirements about things like child support. You have to get a letter saying you're in compliance with your obligations and you have to – there are hoops to jump through, is my point. I don't believe that there are impossible hoops. I don't believe it would be – Are they – I think I'm asking the same question. Are they discretionary or are they – is there any discretion of the court to say, no, you're going to stay in the plan regardless? Or are these just steps that they can take and once completed, this plan ends automatically? Just consult my handy statute here for one moment. Oh, it's a good idea. You'd be surprised how many lawyers come to the lectern without their statute. So 1328a is the super discharge, which you get upon completion. It says subject to – Sounds great. Super discharge, exactly. You should have one of those. As soon as practicable after completion by the debtor of all payments under the plan, and in the case of the debtor who pays all their support obligations and the debtor has to certify that something is done, then the court shall grant the debtor a discharge of all debts provided for by the plan, except any debt that's non-dischargeable. So shall, I believe, is mandatory in the Bankruptcy Code, so I believe in that case you would have to. Again, I think the notion, though, that there's going to be all of these people running to use Chapter 13 for purposes that aren't things like using restructuring their – or bringing current their home mortgage or rearages, their tax of rearages and things like that, and that they're going to gain the system, I think you have other tools under the statute to deal with that. I mean, you have a good faith requirement, and I believe there are other – there are other tools to deal with that. Thank you. So it looks like I have a minute left. You could cede it to the other side. No, it's okay. Or they're so too bravado, you know, you could just say, heck. What I'd like to do is say it might seem unlikely, but there are many reasons why a trustee or an unsecured creditor might not object under – raise their rights under 1325b. Okay? And it's possible maybe the debtor's plan proposes, for example, to liquidate an exempt asset, which you couldn't force them to do, but they're volunteering to do it, so they want to do that. It's possible that the only unsecured creditor in the case is a – is a secured creditor with a deficiency claim who doesn't really care about their deficiency claim, doesn't want to get it over five years, but wants to get their real claim. Or it's possible that just in looking at the plan, it's a good faith bona fide effort. That's what 1325b was enacted to check. 1325b was enacted in 1984. It was in response to perceived abuses of zero-pay plans. It was a compromise. There were – there were proposals to say only debtors who pay 70 percent of their plans back. Sotomayor, can I ask you a question, just before you sit down? And I don't know if you know the answer to this. What's the practical effect if we proceed as the trustee, American Express, would like us to? I mean, is this going to open floodgates of all kinds of plans being out there for a long time? I'm just trying to figure out, usually these cases are – people reach an agreement, don't they? I think that's right, Your Honor. The reference – there have been references in an oral argument before the panel, and I believe in Judge Graber's dissent about how there are plans being proposed that last as few as 10 months. Well, there are plans being proposed. It's like saying there are lawsuits being filed. The difference between a confirmed plan that a judge has signed off on on good faith and a meritorious lawsuit, two very different things. And I believe that the trustee in the argument before the panel could not come up with a single plan that had been confirmed for a 10-month period. I think that those concerns are just greatly overstated. In this particular case, the debtors proposed a plan of 36 months to pay $122 a month. Once the bankruptcy court extended that to 60 months, is it still at $122 a month for 60 months, or did that amount get reduced? That amount did not get reduced, but the amount changed. So when the debtors proposed their plan, they proposed $122 for 36 months. At the 341 meeting, the trustee, I believe, objected to some of the debtors' claimed expenses. I think it was a cable bill or something of that nature. And so that changed the number from 122 to 148. That's not in dispute. No one's questioning the 148, but it has nothing to do with the length. So at confirmation, Judge Jury could either have confirmed the debtors' plan, $148 a month for 36 months, or the trustees' objection, sustain the trustees' objection and make it $148 for 60 months. But the dollar amount does not change. The total dollar amount changes, obviously. Yeah. The total dollar amount that would be paid to unsecured creditors changed, absolutely. Then the debtor couldn't have proposed a lower amount? The debtor ---- Once the judge extended it to 60 months? No, because the amount is what the debtor ---- So it goes back to this bizarre business about you have the fake number, the negative PDI, but then you have the real numbers. So the fake number is on Form 22C, and the real numbers are on Schedules I and J. And Schedules I and J showed that after, again, this meeting with the trustee in 341 where they said this cable bill doesn't work, what those ---- what Schedules I and J showed is that if you look at what the real financial situation is, they could pay 148, which is that number. Okay. Okay? Thank you, Your Honors. Okay. Thank you. You have 11 seconds left. We'll make a minute. Okay. You have a minute. I have one minute. With all due respect to opposing counsel, I believe there was a misstatement of the law that exists in the Ninth Circuit. The question was, when the debtor pays all the payments under the plan, is the plan complete? Under the Friendly decision, that is not the case in the Ninth Circuit. Now, Burchard v. Sunohara was a Ninth Circuit bankruptcy appellant panel, so was Friendly v. Forsythe. And what the bankruptcy appellant panel said in Friendly v. Forsythe is with the changes in BAF-CEPA, there is now a temporal component that applies to the plan, not just the payments, but a temporal component, so that the debtor who has completed all the payments in the plan now must address the temporal component and must modify the plan. And by modifying the plan, it allows all parties to come in and look at the circumstances, mostly the judge, to look at the circumstances under which the debtor is modifying the plan. And it would be up to the judge as to whether the reduction in the plan term would be appropriate or not. Thirteen seconds. Okay. I want to address just one other point, and that is that there seems to be a little confusion between a 0 percent plan and a 0 plan. A 0 percent plan can pay creditors, but it's proposing and gets confirmed and only will pay 0 percent to the unsecured creditors. A 0 plan is a plan that would pay nothing to anyone. And if I understood the questioning correctly, I think there was some concern about 0 plans and why would we keep them open for 60 months. I don't think there would be any court in the United States that would confirm a plan that would pay nothing to any creditors. So I hope that kind of clarifies a little bit now that my minute is up. And I thank the Court. It's been an honor to be here today. Thank you. Thank you. Case is argued sensitive. Roger.
judges: Kozinski, Pregerson, O'scannlain, Thomas, Silverman, Graber, Wardlaw, Paez, Murguia, Christen, Nguyen